**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| MARSHA FOX, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SCANA CORPORATION, KEVIN B. MARSH, JIMMY E. ADDISON and STEPHEN A. BYRNE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Case No.** 3:17-3063-MBS

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Marsha Fox ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SCANA Corporation ("SCANA" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired SCANA securities between January 19, 2016 and September 22, 2017, both dates inclusive (the "Class Period"), seeking to recover

damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     SCANA is an energy-based holding company whose principal subsidiary, South Carolina Electric & Gas Company ("SCE&G"), is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.

3.     Founded in 1924, the Company is headquartered in Cayce, South Carolina. SCANA's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SCG."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, (i) Defendants artificially drove up the price of SCANA's stock by issuing false and misleading statements to investors, and omitting material information, concerning the progress, cost, and completion schedule of the multi-billion dollar nuclear construction project at V.C. Summer Nuclear Station in Fairfield County, South Carolina; (ii) Defendants issued false and misleading statements and omitted material information, concerning the financial health of its lead contractor for the project, Westinghouse Electric Company; and (iii) as a result of the foregoing, SCANA shares traded at artificially inflated prices during the Class Period, and class members suffered significant losses and damages.

5.     Indeed, rather than disclose to the market that the Nuclear Project was facing serious design, construction, and cost headwinds, as described in a secret, 130-page report issued by Bechtel Corporation ("Bechtel") on February 5, 2016 (the "Bechtel Report"), Defendants doubled down on their strategy of deception and misdirection by issuing SCANA produced

promotional videos, press releases, and other public statements that created a fundamentally false and misleading impression to investors that the project was running smoothly within a reasonable budget and on schedule. Yet, as only recently disclosed to investors, for much of the Nuclear Project's history, a formal construction schedule was never in place and costs were spiraling out of control.

6.    In addition to material misstatements and omissions about the status and progress of the Nuclear Project, Defendants also issued false and misleading statements and omitted material information, concerning the financial health of its lead contractor for the project, Westinghouse Electric Company ("Westinghouse"). For example, long before Westinghouse sought bankruptcy protection on March 29, 2017, Defendants harbored grave concerns about Westinghouse's financial viability to continue the construction of the project. This too was never disclosed to investors and was otherwise masked by Defendants' deliberate misinformation campaign to create the false impression to investors and other stakeholders that the project had reached significant milestones and was moving forward as planned.

7.    On July 31, 2017, SCANA's subsidiary South Carolina Electric & Gas Co. ("SCE&G") and Santee Cooper, South Carolina's state-owned electric and water utility, announced that they would abandon construction of two nuclear power plants in South Carolina, citing rising construction costs.

8.    On August 4, 2017, South Carolina Attorney General Alan Wilson announced that he was opening an investigation and state Senate leaders called for a special legislative session to investigate SCANA's abandonment of the Nuclear Project.

9.  In response to these announcements, SCANA's stock price fell approximately 5%, or $3.36 per share, to close at $63.79 per share on August 4, 2017, after several days of unusually heavy trading volume.

10.  On August 10, 2017, *The Post and Courier* published a "Top Story" article entitled "CEO: SCANA may not return to scuttled nuclear project—even if a new partner emerges." The article reported on Defendant Marsh's comments to state lawmakers that "he wasn't sure he would want to take the project back up after it fell years behind schedule and its costs soared billions of dollars over budget."

11.  Following this news, SCANA's share price fell $1.32, or 2.13%, to close at $60.69 on August 11, 2017.

12.  The same day, *Seeking Alpha* published an article commenting on Defendant Marsh's announcement. The article stated that "[a]bandonment of nuclear plant under construction is a dramatic and unexpected move that is meeting political uproar." The article further stated that "[SCANA] had made no indication that they were considering abandonment. Even the Regulators were taken by surprise. In fact, the Chairman of the Public Service Commission of South Carolina was quoted as asking senior management at an ex parte briefing "are the three of you aware that this Commission was blindsided yesterday by this news?"

13.  On August 29, 2017, *The Post and Courier* reported that a second class action had been filed on behalf of SCE&G customers, accusing SCE&G and SCANA of fraud and negligence in the years preceding the decision to abandon construction of the company's nuclear power plants.

14.  Following this news, SCANA's share price fell $0.84, or 1.39%, over the following two trading sessions, to close at $59.75 per share on August 30, 2017.

15.     On September 22, 2017, South Carolina Attorney General Alan Wilson requested that the State Law Enforcement Division ("SLED") launch a criminal investigation related to the Nuclear Project.

16.     On this news, SCANA's share price fell $1.96, or 3.43% per share, to close at $55.22 per share on September 22, 2017.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

20.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). SCANA operates within this District and the Company's principal executive offices are located within this Judicial District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiff, as set forth in the attached Certification, acquired SCANA securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23.     Defendant SCANA is incorporated in South Carolina, with principal executive offices located at 220 Operation Way, Cayce, South Carolina 29033-3701.

24.     Defendant Kevin B. Marsh ("Marsh") has served as the Company's Chairman of the Board and Chief Executive Officer ("CEO") since December 2011. Marsh became president of SCE&G in 2006 and became President and Chief Operating Officer of SCANA in January 2011. Marsh became Vice President and Chief Financial Officer ("CFO") of SCANA in 1996, and became Senior Vice President of SCANA in 1998.

25.     Defendant Jimmy E. Addison ("Addison") has served as the Company's CFO and Executive Vice President since April 2006 and January 2012, respectively.

26.     Defendant Stephen A. Byrne ("Byrne") has served as the Company's Executive Vice President since 2009. Byrne has served as President, Generation and Transmission and Chief Operating Officer of SCE&G since 2011.

27.     The defendants referenced above in ¶¶ 24-26 are sometimes referred to herein as the "Individual Defendants."

28.     The Individual Defendants possessed the power and authority to control the contents of SCANA's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public,

the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

### SUBSTANTIVE ALLEGATIONS

### Background

29.     SCANA Corporation, through its subsidiaries, engages in the generation, transmission, distribution, and sale of electricity to retail and wholesale customers in South Carolina. SCANA's principal subsidiary, SCE&G, is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.

### Materially False and Misleading Statements Issued During the Class Period

30.     The Class Period begins on January 19, 2016 when SCANA issued a press release and video "Highlighting a Year of Progress for V.C. Summer Units 2 and 3." The press release touted the "achievement" of several "milestones" for "V.C. Summer," stated that "[t]he nuclear construction team concluded the year on a high note," and noted that "work continued steadily on the construction site . . . ."

31.     On February 5, 2016, Bechtel delivered the secretly commissioned Bechtel Report to SCANA and SCE&G. In the report, which was never made public until September 4, 2017, Bechtel informed SCANA and SCE&G that Westinghouse lacked a legitimate schedule to build the reactors:

> [T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success:
>
> - While the Consortium's engineering, procurement, and construction plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.

7

- The Consortium's project management approach does not provide appropriate visibility and accuracy to the Owners on project progress and performance.

- The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis.

- There is a lack of a shared vision, goals, and accountability between the Owners and the Consortium.

- The Consortium lacks the project management integration needed for a successful protect outcome.

- The WEC-CB&I relationship is strained, caused to a large extent by commercial issues.

- The overall morale on the project is low.

- The Contract does not appear to be serving the Owners or the Consortium particularly well.

- The issued design is often not constructible resulting in a significant number of changes. The construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize impacts.

- There is significant engineering and licensing workload remaining (currently over 800 engineers) ITAAC closure will be a significant effort.

- Emergent issues potentially requiring NRC approval of LARs remain a significant project concern.

- There is a significant disconnect between construction need dates and procurement delivery dates.

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program.

- Construction productivity is poor for various reasons including changes needed to the design sustained overtime, complicated work packages, aging workforce etc.

- The indirect to direct craft ratio is high.

- Field non-manual turnover is high.

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance.

- The schedule for the startup test program is in the early stages of development. The BIP turnover rate appears to be overly aggressive.

32.    In March 2016, a month after receiving the Bechtel Report, Defendant Marsh stated in a letter to shareholders that *"[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."*

33.    On April 28 2016, SCANA held a conference call with analysts and investors to discuss the Company's first quarter 2016 earnings and operations. During the conference call, Defendant Byrne answered an analyst's questions regarding SCE&G's progress in constructing the V.C. Summer reactors. Byrne reassured the analyst that SCE&G's contractors were "doing a tremendous job" and that progress was "better than we expected."

> **[Analyst]:** Okay. And then, I think you mentioned on the nuclear that the current critical path item is the shield building. And I know that in your report that you filed in February that was mentioned there as well. *I was just wondering if you could update us on the status of that in terms of the components that are being fabricated, and so forth.*
>
> **[Defendant Byrne]:** *Yes. Dan, the shield building is going probably better than we had anticipated.* Our concern for the shield building really came from the contractor, their concerns, and at the time, that was Chicago Bridge and Iron. Now, Fluor has taken over. But we still retained the CB&I Services crew that is doing that welding. So even though CB&I Power exited the Consortium, the CB&I Services folks who are doing the containment vessel welding and the shield building welding stay. *They're doing a tremendous job.*
>
> ***
>
> *So overall, I'd say the shield building's going a little better than we expected.*

34.    On May 1, 2016, Santee Cooper CEO Lonnie Carter sent a private letter to Jose Gutierrez, the interim President and CEO of Westinghouse: "Unfortunately, our experience with Westinghouse . . . has been set in a trend of continuous deceit and non-transparency."

35.     In June 2016, Defendant Marsh sent a private email to Mamoru Hatazawa, Executive Officer of Toshiba Corporation (the parent company of Westinghouse) as follows: "We have no doubt that we have been the victim of financial malfeasance by [Westinghouse] and Toshiba." In another email on June 8, 2016, March informed Mr. Hatazawa that "[w]e continue to be taken aback by what we see as Toshiba's lack of respect" and stating that Toshiba "is not acting honorably."

36.     On or around June 30, 2016, SCANA issued a "V.C. Summer Nuclear Station Units 2 & 3 Quarterly Report" to the South Carolina Office of Regulatory Staff ("ORS"). This report stated that "[w]hile certain aspects of the work present challenges to the completion schedule, overall progress continues . . . . ."

37.     On July 28, 2016, SCANA held a conference call with analysts and investors to discuss the Company's second quarter 2016 earnings and operations. During the conference call, Defendant Byrne answered an analyst's questions regarding the "timeline and schedule on the project and specifically on the milestones" and "ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project." Byrne reassured the analyst that the reactors' "guaranteed substantial completion dates remained" the same and that he did not "expect anything dramatic to come from" Westinghouse's recent change in subcontractors.

> **[Analyst]:** So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones, if you could provide a little bit more of an update there; and ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project.
>
> **[Defendant Byrne]:** Yes, Julien, this is Steve. ***The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3. We don't see anything to change those.*** Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse. And remember that on the project now, we're dealing just with Westinghouse; Fluor is a subcontractor to Westinghouse. I don't expect

anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. ***So I don't expect anything dramatic to come from that.***

(Emphasis added.)

38.     On October 7, 2016, SCE&G "[p]ublished" a video on YouTube of Defendant Marsh speaking to reporters on September 21, 2016, at the "V.C. Summer Media Day 2016." In the video, Defendant Marsh stated: ***"Well they say well if you could do it again, would you make the same decision? And absolutely I would make the same decision. I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future."*** Marsh further stated that ***"with projects of this nature, you're gonna have some challenges . . . but we've been able to meet those challenges, make adjustments to the contract, and continue progress on the project."*** Marsh reiterated:

> ***We're excited about where we are, we've had challenges, we've been able to work through those challenges***, because you're not gonna go through a project that's gonna be ten or twelve years without issues come up. I would offer if you've ever built a house, whether it took twelve months or eighteen months, you had a couple issues, you had a couple of change orders along the way, and the likelihood is that didn't reduce the cost of your house as you went through that process.

39.     On October 27, 2016, SCANA held a conference call with analysts and investors to discuss the Company's third quarter 2016 earnings and operations. During the conference call, Defendant Byrne answered an analyst's questions regarding whether Westinghouse's subcontractor to build the nuclear reactors was "maybe having some troubles in terms of staffing up for the evening shift . . . ." Byrne reassured the analyst that the reactors' "guaranteed substantial completion dates remained" the same and that he did not "expect anything dramatic to come from" Westinghouse's recent change in subcontractors. Byrne reassured the analyst that Westinghouse's

11

subcontractor was "doing a good job"; that "we're very happy with what [the subcontractor] is doing for us"; and that the subcontractor has "been very successful recently":

> **[Analyst]:** Okay. And then I think in your last update report, there was also some discussion about Fluor maybe having some troubles in terms of staffing up for the evening shift or whatever. I wondered if you could update us on that.

> **[Defendant Byrne]:** Yes, Fluor, when they first came in, identified the need to increase staffing and wanted to staff a full back-shift or night-shift because we'd been operating with a skeleton crew night-shift or back-shift up to that point. Initially, they had some difficulty in hiring, but I'd say that they recently have rectified that. . . . ***So they're doing a good job.*** They're trying some innovative things, implementing multilingual workforces, those kinds of things. ***So we're very happy with what Fluor is doing for us. So they've been very successful recently.***

> (Emphasis added.)

40.     Also on October 27, 2016, SCANA issue a video on YouTube titled "SCE&G Welcomes News Media to Nuclear Construction Site" featuring "members of the V.C. Summer leadership team." In the video, Defendant Byrne spoke to reporters on September 21, 2016, at the "V.C. Summer Media Day 2016." Byrne "gave the journalists an overview of the massive construction site before they boarded a bus to see it for themselves." Holding a microphone, Byrne stated: "The pace of this project is quickening. Though we have run into some issues and roadblocks in the past, most of those issues and roadblocks are behind us."

41.     On February 14, 2017, Toshiba announced that it would delay the release of its quarterly earnings report due to concerns around the company's accounting controls, specifically as they related to its U.S. nuclear subsidiary Westinghouse, which Toshiba estimated would require it to take a $6.3 billion write-down related to SCANA's nuclear project. Toshiba's chairman, Shigenori Shiga, announced his resignation to take responsibility for the massive write-down.

42.     Also on February 14, 2017, SCANA issued a quarterly report to the ORS that included "a revised completion schedule" for the two Nuclear Project reactors "of April 2020 and December 2020" – later than the previous completion dates of August 2019 and August 2020.

43.     Upon these and other revelations, SCANA's stock price fell approximately 6.25%, or $4.38 per share, from a closing price of $70.03 on February 13, 2017, to a closing price of $65.65 on February 17, 2017, on unusually heavy trading volume.

44.     Despite these announcements which revealed some – but not the full extent – of the troubles affecting SCANA, Westinghouse, Toshiba, and the Nuclear Project, Defendants continued to make false and misleading statements to the market.

45.     On February 16, 2017, SCANA held a conference call with analysts and investors to discuss the Company's first quarter 2017 earnings and operations. During the conference call, Defendant Marsh stated that "we still anticipate completing our two new nuclear units" and that "we are making substantial progress on these new plants":

> We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units*, which will enable us to provide our customers with safe, reliable energy for decades to come. . . . *As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes.*

46.     During the same call, Defendant Byrne reassured analysts that SCANA would still reach its "2020 deadline" because "efficiency factors have increased significantly," things were "going much, much more smoothly," and that "we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us." Specifically, Byrne stated as follows:

> **[Defendant Byrne]:** . . . When you say the second unit, you talking about the second new unit or are you talking about Unit 2, which is the first new unit?

13

**[Analyst]:** Sorry. Yes, the second new unit and the –

**[Defendant Byrne]:** Second new unit.

**[Analyst]:** -- 2020 deadline.

**[Defendant Byrne]:** Yes. ***So what we've seen so far is that the efficiency factors have increased significantly . . . and it's going much, much more smoothly. So I have a reasonable confidence in the efficiency gains for the second new unit.***

***

**[Analyst]:** And also, I think in an earlier question you were talking about the various critical paths, activities that you have coming up here over the first half of this year and going forward. How close are you guys to getting to the point where the construction project is, like now becomes a more traditional construction project in the nuclear in and of itself is no longer like the defining factor in terms of getting from here to there?

**[Defendant Byrne]:** ***Yes. I think we're actually pretty close to that. . . . I think we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us.***

47.    Between February 28 and March 2, 2017, SCANA attended the 2017 UBS & Morgan Stanley Utilities Conferences, at which the Company published a "2017 UBS & Morgan Stanley Utilities Conferences Presentation" for investors and industry analysts. This presentation included the following slide, which graphically showed that SCANA's "Current Position" on the "Manufacturing Schedule" for the V.C. Summer reactors was nearly complete:



48.     On March 29, 2017, Westinghouse filed to reorganize its business under the protection of Chapter 11 of the U.S. Bankruptcy Code.

49.     On April 12, 2017, Defendants March, Addison, and Byrne gave an "Ex Parte Briefing" to the PSC concerning Westinghouse's March 29 bankruptcy filing. During the briefing, Defendant Byrne stated that "[s]ince the bankruptcy, Westinghouse has been generally cooperative and responsive to our requests for information"; that "we expect this cooperation to continue"; and that "work continues on-site without substantial disruption."

50.     During the briefing to the PSC, Defendants presented another slide to the PSC showing that the "Manufacturing Completion Schedule" for the V.C. Summer reactors was nearing completion:



51. The statements referenced in ¶¶ 30, 32-33, 36-40, 45-47, and 49-50 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, (i) Defendants artificially drove up the price of SCANA's stock by issuing false and misleading statements to investors, and omitting material information, concerning the progress, cost, and completion schedule of the multi-billion dollar nuclear construction project at V.C. Summer Nuclear Station in Fairfield County, South Carolina; (ii) Defendants issued false and misleading statements and omitted material information, concerning the financial health of its lead contractor for the project, Westinghouse Electric Company; and (iii) as a result of the foregoing, SCANA shares traded at artificially inflated prices during the Class Period, and class members suffered significant losses and damages.

**The Truth Begins to Emerge**

52.     On July 31, 2017, SCANA's subsidiary South Carolina Electric & Gas Co. ("SCE&G") and Santee Cooper, South Carolina's state-owned electric and water utility, announced that they would abandon construction of two nuclear power plants in South Carolina, citing delays and construction cost overruns.

53.     On August 2, 2017, *The Post and Courier* of Charleston published an article entitled "S.C. lawmakers want SCANA shareholders to eat costs of two failed nuclear reactors." The article stated, in relevant part:

> A bipartisan group of legislators met in the Statehouse on Wednesday to condemn utility regulators, the executives of SCANA and the board of the state-operated utility Santee Cooper, which partnered on the V.C. Summer expansion projects more than a decade ago.
>
> Many of the lawmakers went a step further, claiming they will investigate how to stop the executives and investors of SCANA — the parent company of [SCE&G] — from charging customers between $2 billion to nearly $5 billion in costs over the next 60 years for the wasted concrete, steel and labor pumped into the unfinished reactors.

54.     On August 4, 2017, South Carolina Attorney General Alan Wilson announced that he was opening an investigation and state Senate leaders called for a special legislative session to investigate SCANA's abandonment of the Nuclear Project.

55.     In response to these announcements, SCANA's stock price fell approximately 5%, or $3.36 per share, to close at $63.79 per share on August 4, 2017, after several days of unusually heavy trading volume.

56.     On August 10, 2017, *The Post and Courier* published a "Top Story" article entitled "CEO: SCANA may not return to scuttled nuclear project — even if a new partner emerges." The article reported on Defendant Marsh's comments to state lawmakers that "he wasn't sure he would

want to take the project back up after it fell years behind schedule and its costs soared billions of

dollars over budget."

57.     Following this news, SCANA's share price fell $1.32, or 2.13%, to close at $60.69

on August 11, 2017.

58.     The same day, *Seeking Alpha* published an article commenting on Defendant

Marsh's announcement. The article stated that "[a]bandonment of nuclear plant under construction

is a dramatic and unexpected move that is meeting political uproar." The article further stated that

"[SCANA] had made no indication that they were considering abandonment. Even the Regulators

were taken by surprise. In fact, the Chairman of the Public Service Commission of South Carolina

was quoted as asking senior management at an ex parte briefing "are the three of you aware that

this Commission was blindsided yesterday by this news?"

59.     On August 29, 2017, *The Post and Courier* reported that a second class action had

been filed on behalf of SCE&G customers, accusing SCE&G and SCANA of fraud and negligence

in the years preceding the decision to abandon construction of the company's nuclear power plants.

60.     Following this news, SCANA's share price fell $0.84, or 1.39%, over the following

two trading sessions, to close at $59.75 per share on August 30, 2017.

61.     On August 31, 2017, *The Post and Courier* published an article titled "Secretive

report on South Carolina nuclear reactor construction never given to state utility regulators." The

article stated:

> SCANA Corp. may have misled state utility regulators about the existence of a
> secretive report that detailed construction failures at two troubled nuclear reactors
> at the V.C. Summer station in Fairfield County, months before the $9 billion energy
> project was abandoned.
>
> The director of the state Office of Regulatory Staff told The Post and Courier on
> Thursday that SCANA officials repeatedly told state agency employees they didn't
> have a copy of a report that was produced by Bechtel Corp., an engineering and

project management company that observed the nuclear construction near Jenkinsville in past years.

"They have continued to ask for it," said Dukes Scott, the regulatory staff director. "As we asked for it, they never said, 'Yes, here it is.'"

Those state regulators were surprised last week when SCANA and Santee Cooper officials admitted under oath in a Senate hearing the document did exist, and they were again denied access to it by SCANA, who is now claiming it as legally privileged information.

Eric Boomhower, a communications director for SCANA, said the reason the company is treating the document as privileged information is because the investor-owned utility and Santee Cooper hired Bechtel in anticipation of suing Westinghouse, the designer of the reactors and the primary contractor at V.C. Summer.

"SCANA prefers to respect the legislative review process by not commenting on its actions in response to the report at this time," Boomhower added.

Santee Cooper, which isn't overseen by state utility regulators, didn't respond to questions sent from the newspaper this week about the report.

Lawmakers on two special legislative committees in the S.C. House and Senate have requested the document. It reportedly points out problems with the reactors' construction and offered recommendations of how to correct the nuclear build-out that was abandoned at the end of July.

The exact findings of the report are not known but lawmakers hope the previously undisclosed document will shed some light into why electric customers are paying for two unfinished nuclear reactors that are only 30 percent complete and lacked a legitimate construction schedule.

Roughly 5,000 workers were fired at V.C. Summer when investor-owned SCANA and state-run Santee Cooper pulled the plug on the decade-long construction effort that was supposed to usher in a new age of nuclear power in the United States.

But to this point, nobody outside the two partnering utilities has seen the report. Gov. Henry McMaster, who oversees the 11-member board of Santee Cooper, knew nothing of it before last week. Later Thursday, McMaster sent a letter to Santee Cooper Chairman Leighton Lord asking for a copy of the report immediately.

Members of the state's regulatory staff heard about the report, compiled by Bechtel, the country's largest construction and civil engineering company, through conversations with workers at the V.C. Summer site in past years. But when the utility watchdog agency inquired about the document, Scott said his staff was told by SCANA officials that the utility didn't have a physical copy of any report.

SCANA employees informed state regulators that Bechtel had only orally communicated with them about the San Francisco-based company's work at V.C. Summer, Scott said.

Much is still unknown about Bechtel's work, including who paid for the report, what date Bechtel started its analysis, when it was completed, who it was delivered to and what problems it pointed out.

The report was initiated after Santee Cooper, the minority owner of the now-canceled reactors, pushed to have a third-party company analyze the construction effort, according to Lord.

By that point, the project had already seen one temporary construction schedule after another fail and the total cost for the two reactors increase dramatically.

Lord didn't go into detail about what findings or recommendations were contained in the report, but he told The Post and Courier it led Santee Cooper's board to issue a call for an independent construction monitor at the V.C. Summer site.

SCANA, which was primarily in charge of building and starting the reactors, rejected the call to hire a third-party construction monitor, according to Santee Cooper's chairman.

SCANA's failure to provide the state's utility regulators with the report has raised questions from state lawmakers leading the special committees.

"Some things just aren't quite adding up," said Rep. Russell Ott, a St. Matthews Democrat who co-chairs the House committee. "If a report surfaces, then we are going to have a situation where we will have to find out who is telling the truth."

SCANA and Santee Cooper have yet to hand over the report to senators and representatives investigating the nuclear plant debacle. But the committees have threatened to subpoena the document if the utilities don't comply. The Senate asked for the utilities to hand over the document by Sept. 7.

"We understand the Senate committee has indicated they plan to issue a subpoena for production of this document," the House committee wrote in their letter to the utilities. "We would hope to avoid that process but are willing and able to issue our own subpoena if forced to."

*The Post and Courier* has requested the report through the state's Freedom of Information Act.

McMaster, who has been pushing for a sale of Santee Cooper since the reactors were cancelled last month, said he's asked the state-run utility to produce whatever documents lawmakers need to investigate the reactors' failure.

"We've asked Santee Cooper to be forthcoming with information," McMaster said. "There are some things by law or agreement they can do, some things they can't, but our intention is to get every piece of information that would be of any interest at all to these people, these companies who are interested in purchasing some or all of Santee Cooper or entering into any other kind of agreement."

62.     On September 22, 2017, South Carolina Attorney General Alan Wilson requested that the State Law Enforcement Division ("SLED") launch a criminal investigation related to the Nuclear Project.

63.     On this news, SCANA's stock price fell $1.96 or 3.43% per share, to close at $55.22 per share on September 22, 2017.

64.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired SCANA securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SCANA securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SCANA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SCANA;

- whether the Individual Defendants caused SCANA to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of SCANA securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- SCANA  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold SCANA securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

73.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SCANA securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SCANA securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

77.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SCANA securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SCANA's finances and business prospects.

78.    By virtue of their positions at SCANA , defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of SCANA, the Individual Defendants had knowledge of the details of SCANA's internal affairs.

80.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of SCANA.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SCANA's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SCANA securities was artificially inflated throughout the Class Period.  In

ignorance of the adverse facts concerning SCANA's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SCANA securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

81.     During the Class Period, SCANA securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SCANA securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SCANA securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of SCANA securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

82.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

84.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.     During the Class Period, the Individual Defendants participated in the operation and management of SCANA, and conducted and participated, directly and indirectly, in the conduct of SCANA's business affairs.  Because of their senior positions, they knew the adverse non-public information about SCANA's misstatement of income and expenses and false financial statements.

86.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SCANA's financial condition and results of operations, and to correct promptly any public statements issued by SCANA which had become materially false or misleading.

87.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SCANA disseminated in the marketplace during the Class Period concerning SCANA's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SCANA to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of SCANA within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SCANA securities.

88.    Each of the Individual Defendants, therefore, acted as a controlling person of SCANA.  By reason of their senior management positions and/or being directors of SCANA, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SCANA to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of SCANA and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

89.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by SCANA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

/s/ Robert D. Dodson
Robert D. Dodson

28

Federal I.D. Number 7249
Law Offices of Robert Dodson, P.A.
1722 Main Street, Suite 200
Columbia, SC  29201
Telephone (803) 252-2600
Facsimile (803) 771-2259
Email: rdodson@rdodsonlaw.com


**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application to be filed)
J. Alexander Hood II
(*pro hac vice* application to be filed)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(*pro hac vice* application to be filed)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application to be filed)
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*

Columbia, SC
November 10, 2017

29